# EXHIBIT 3

# EXHIBIT 3

**MINUTES OF THE**
**SENATE COMMITTEE ON JUDICIARY**

**Seventy-sixth Session**
**March 2, 2011**

The Senate Committee on Judiciary was called to order by Chair Valerie Wiener at 8:03 a.m. on Wednesday, March 2, 2011, in Room 2149 of the Legislative Building, Carson City, Nevada. The meeting was videoconferenced to the Grant Sawyer State Office Building, Room 4412E, 555 East Washington Avenue, Las Vegas, Nevada. Exhibit A is the Agenda. Exhibit B is the Attendance Roster. All exhibits are available and on file in the Research Library of the Legislative Counsel Bureau.

**COMMITTEE MEMBERS PRESENT:**

Senator Valerie Wiener, Chair
Senator Allison Copening, Vice Chair
Senator Ruben J. Kihuen
Senator Mike McGinness
Senator Don Gustavson
Senator Michael Roberson

**COMMITTEE MEMBERS ABSENT:**

Senator Shirley A. Breeden (Excused)

**GUEST LEGISLATORS PRESENT:**

Senator Joseph (Joe) P. Hardy, Clark County Senatorial District No. 12

**STAFF MEMBERS PRESENT:**

Linda J. Eissmann, Policy Analyst
Bradley A. Wilkinson, Counsel
Kathleen Swain, Committee Secretary

**OTHERS PRESENT:**

Pat Lundvall
Roger Norman
Yvonne Murphy, Tahoe Reno Industrial Center; Storey County

Senate Committee on Judiciary
March 2, 2011
Page 2

Bill Bradley, Nevada Justice Association
Lora E. Myles, County Recorders
Alan H. Glover, Former Senator; Carson City Clerk/Recorder
Rocky Finseth, Nevada Land Title Association

CHAIR WIENER:
I will open the hearing on Senate Bill (S.B.) 156.

SENATE BILL 156: Limits the liability of certain persons involved with an off-road sporting event. (BDR 3-791)

SENATOR DON GUSTAVSON (Washoe County Senatorial District No. 2):
This bill was brought by request. People in Las Vegas and Carson City want to testify in support of this bill.

PAT LUNDVALL:
This bill modifies chapter 41 of the Nevada Revised Statutes (NRS). Nevada Revised Statute 41.510 says a landowner owes no duty to those who participate in recreational activities on the premises. We proposed a bill clarifying the duties owed by a landowner to participants and spectators of off-road racing events. The amendment would establish the limited duty rule, which gives more protection to participants and spectators.

Baseball parks and hockey rinks have potential hazards associated with spectators. A foul ball or hockey puck may go into the stands. The Nevada Supreme Court issued Turner v. Mandalay Sports Entertainment, LLC, 124 Nev. 213 (2008), which identifies a limited duty owed to stadium owners in an effort to ensure the safety and security of spectators and participants in baseball. The Court identified the purpose behind the limited duty rule. The Turner case states the limited duty rule "… serves the important purpose of limiting expensive and protracted litigation that might signal the demise or substantial alteration of the game of baseball as a spectator sport."

Off-road racing deserves that protection so it is not subjected to expensive and protracted litigation. Twelve jurisdictions have the limited duty rule. This bill would bring us from no duty to limited duty. The limited duty would ensure the safety of the sport, its participants and spectators.

Senate Committee on Judiciary
March 2, 2011
Page 3

ROGER NORMAN:
I will show a video depicting off-road racing (Exhibit C, original is on file in the Research Library). This video has run on national television for two weeks. I want to take off-road racing to the next level.

I will read from my written testimony (Exhibit D).

Our sport is different from NASCAR because it requires a 100-mile or 600-mile course, not a 1.5-mile course. It is more difficult than NASCAR, and that is why this bill is needed.

SENATOR COPENING:
Have off-road races not come to Nevada because this law is not in place? Have race officials specifically said they need immunity before they will bring races to Nevada?

MR. NORMAN:
Not many races have occurred on private property where permanent infrastructure could be used. That would make our sport safer. They do not come because there is too much risk.

SENATOR COPENING:
Are you going to remove off-road races from public land and have them on private land?

MR. NORMAN:
In many cases, they could start on private land and go onto U.S. Bureau of Land Management (BLM) property. Nevada has many locations where everything could be held on private property.

SENATOR GUSTAVSON:
The facilities could be built permanently on private property, and most of the spectators would be there. The Committee is concerned about safety on the entire raceway.

MR. NORMAN:
That is correct. It would allow the race promoters to build permanent infrastructure so spectators could watch the races. Promoters cannot afford to put up bleachers for 15,000 to 20,000 people each time.

Senate Committee on Judiciary
March 2, 2011
Page 4

SENATOR COPENING:
How can you guarantee the promoters would actually build that infrastructure on private land? Perhaps we need a companion bill specifying what structures are to be built on private land to ensure safety. Is BLM reluctant to have off-road races on its land because of the race in California where people were killed?

MR. NORMAN:
That is one of the biggest fears. One of my teammates lost his son in that accident. We had a fund-raiser for the families who lost loved ones. Everyone came together and talked about it. My teammate, who lost his son, told me what Colorado does to protect ski resorts and baseball games. If we have something like New Zealand, people would come to Nevada from all over the world.

SENATOR KIHUEN:
Do other states limit the liability?

MR. NORMAN:
States across the Country have limited liability for events like baseball and hockey.

SENATOR KIHUEN:
Have other states done this particularly for off-road racing?

MR. NORMAN:
Off-road racing started 42 years ago in Nevada. It started 43 years ago in Baja, California. This is the location for off-road racing in the United States.

YVONNE MURPHY (Tahoe Reno Industrial Center; Storey County):
My clients support S.B. 156 and encourage passage. This legislation will eliminate frivolous lawsuits and encourage participants of various sporting events to play responsibly.

BILL BRADLEY (Nevada Justice Association):
We oppose S.B. 156. The Nevada Justice Association opposes immunity from civil lawsuits. Immunity takes the decision of whether a person's conduct was reasonable away from a judge and jury, allowing the Legislature to prejudge an individual's case before hearing the facts. Granting immunity removes the

Senate Committee on Judiciary
March 2, 2011
Page 5

incentive to act safely. Creating immunity results in less personal responsibility and individual accountability. I disagree with Pat Lundvall. Juries should decide negligence cases based on the facts, not prejudging cases before the facts are heard.

I will show a video of the race in southern California (Exhibit E, original is on file in the Research Library).

As you can see at the end of this video, the crash has occurred. One of the racers has gone off the course. Tragically, many people were killed and many more seriously injured.

In Mr. Norman's video, there appears to be adequate crowd control. In Exhibit E, the crowd control is negligent. High-powered vehicles drive at speeds in excess of 70 or 80 miles per hour along a dirt road where participants are adjacent to the road. It is difficult to see, and there is little or no crowd control.

In negligence cases, we evaluate whether a person's conduct was reasonable under the circumstances. Every lawyer considers that question before he files a case. The statute I handed to you (Exhibit F) is the lawyer pays law that requires lawyers to consider whether a person's conduct was reasonable. I am referring to NRS 7.085, which requires lawyers to file, defend and maintain actions in a nonfrivolous manner. If a judge determines a lawyer filed and defended an action in a frivolous manner, that lawyer is personally responsible to pay the fees associated with the filing of a frivolous lawsuit.

In a general negligence case, we look at the facts and speak to experts to determine if the conduct of the person you are looking at was reasonable. If it was unreasonable, we file a case. If a person's conduct is negligent, our law allows that person to be sued.

There are checks and balances in the judicial system. When I file a complaint, if opposing counsel disagrees with my position, that counsel can file a motion to dismiss before the case gets started. The judge reviews the motion and determines whether there are enough facts to go forward in the case.

Then, the discovery process begins. Opposing counsel is trying to discover what my client may have done wrong. Our law has evolved to the point where we measure the conduct of the defendant, whether it was appropriate or

Senate Committee on Judiciary
March 2, 2011
Page 6

inappropriate, under the guidance of a judge. The same judge and jury evaluate whether the spectator's conduct was reasonable under the circumstances. If there are enough facts to go forward, the judge allows the case to continue. At the end of discovery, a motion for summary judgment can be filed. Again, the judge reviews the case.

If we have satisfied those checks and balances, we are allowed to try the case in front of a jury. If a jury decides in our favor, the judge is asked if the jury acted correctly. If the judge agrees, the verdict stands, and we go to the Nevada Supreme Court where there is another check and balance.

The checks and balances in the judicial system are appropriate with respect to negligence cases. To grant immunity to those who promote, organize and charge for the opportunity to participate in these races is inappropriate.

Senator Copening's comments regarding infrastructure sound like a good idea. The law does not prohibit a person from building the infrastructure if he can acquire the private land. Part of that infrastructure would be appropriate crowd control. I agree with Mr. Norman that some individuals may not pay attention and go beyond the crowd controls. Our law recognizes that person is a trespasser who did not have a right to be there and violated the rules established by the promoter and organizer. Under those circumstances, a Nevada judge or jury would find that person was disregarding the rules and is responsible for the injury.

It is important to listen to the facts and circumstances on a case-by-case basis and allow the judicial system to work. It protects promoters in appropriate circumstances and holds them accountable in certain circumstances. It protects spectators in certain circumstances and holds them accountable in certain circumstances.

CHAIR WIENER:
I am concerned about assumption of risk. As testified earlier, under the limited duty rule, members of the public should be held accountable if they choose to participate. You testified promoters would be responsible to establish some of the rules and parameters for participating in the event. People would assume the risk if they go outside those parameters or step beyond the safety zone. Is that what you are saying?

Senate Committee on Judiciary
March 2, 2011
Page 7

MR. BRADLEY:
Yes. Our laws put duties and responsibilities on all people to act reasonably. Anyone who acts outside the bounds of reasonableness is considered to be negligent. The assumption of the risk doctrine says if you know it is dangerous and you step into a danger zone, you have assumed the risk.

In Mr. Norman's video with appropriate crowd control, people could not step into the zone of danger. Unfortunately, there was poor crowd control in the California race. We do not know what the promoters did or did not do. A judge and jury should hear that before deciding whether those injured and killed have the right to bring a claim.

CHAIR WIENER:
Is the limited duty rule being used in many states?

MR. BRADLEY:
I am familiar with the cases Ms. Lundvall and Mr. Norman discussed regarding baseball parks and stadiums where there is certain assumption of the risk. In that particular case, the court found that people sitting in the zone of danger have assumed part of the risk if they cannot do anything about that risk. However, if the owners of that stadium know fast balls or released bats are going into a particular area, there is foreseeability. Foreseeability is an important element of negligence cases. Under those circumstances, the owner/promoter/organizers must take reasonable steps to protect spectators. They are not an insurer of the people's safety, but the law requires them to take reasonable steps to protect the public.

Off-road racing presents the same circumstance. I hope off-road racing can stay in Nevada. It is a good sport and has a lot of opportunity. It is also associated with a lot of danger. By applying a reasonable standard to the conduct of the promoters, organizers and the spectators, we balance the interests of protecting the safety of the public and promoting reasonably safe activities in our State.

SENATOR COPENING:
If safety measures were in place as determined by some governing body for the off-road racing sport, would you feel differently about this bill? Would you want to apply the limited duty rule to promoters, organizers or private property owners who hold the events on their property?

Senate Committee on Judiciary
March 2, 2011
Page 8

MR. BRADLEY:
If permanent facilities are built on private land and the organizers take reasonable steps to be candid, I am not sure I am comfortable with the government saying what is and is not safe. I would like people involved in the sport. The NASCAR course in Las Vegas is a good example. People used to handling crowd control, recognizing curiosity of spectators and recognizing the danger of the sport came together and designed a reasonably safe facility. The NASCAR course in southern Nevada is a safe course. In the corners, crashes can occur and debris can fly into the stands. In those circumstances, our law recognizes what is reasonable and what is not.

SENATOR COPENING:
A governing body would ensure we feel comfortable that safety measures are put in place. Experts should be the ones who design it. At off-road races, someone should walk the course to make sure safety measures are in place. I understand they are not there right now. I published an off-road racing magazine in the early 1990s. I have been to many off-road races. Safety measures were not in place then, but they need to be.

The bill does not include safety measures. It needs a companion bill. That is why I am asking you if you would be comfortable giving off-road races immunity if safety measures were in place. Baseball fields put up netting, and hockey fields put up the plexiglass, yet spectators know there is a certain amount of risk involved in attending the event. The same would hold true for off-road racing if those safety measures were in place.

MR. BRADLEY:
The problem is tying in a bill. You would want to use the words "appropriate safety measures." Who decides what is appropriate?

SENATOR COPENING:
There are many examples of bodies that decide what is appropriate and oversee sporting events. We can arrive at what is appropriate. We need to assemble the right people to arrive at that. You cannot say we will never agree on what is appropriate because otherwise we would not have many of the sporting events we have.

Senate Committee on Judiciary
March 2, 2011
Page 9

Mr. Bradley:
I agree with you that we could determine what is appropriate. It will be on a case-by-case basis. I am not sure about using the words "appropriate safety devices" in a bill as defined by an organization. I am not sure if the BLM or governmental agencies have that kind of oversight on these races. My experience is that a government agency charges a lot of money for the permit and then backs away from everything. They require the promoters and organizers to sign a clause saying if people get hurt, they are responsible for the exposure.

Defining "appropriate" in a bill does not cover each circumstance. If you are specific—e.g., crowd-control barriers shall be established 100 yards throughout the course—perhaps there would be something to define. That is difficult to do.

Senator Copening:
That is what I am trying to say. A group of people should meet and decide what safety measures should be taken. This has been done for other sports. Off-road racing needs regulations to satisfy the experts, including governing bodies. We can arrive at what is appropriate.

Mr. Bradley:
There were no legislative attempts to define "appropriate" for ballparks. We have represented people with injuries in baseball stadiums, and you speak to the experts on a case-by-case basis because one baseball field may be a significantly different design than another. I have never seen those specific appropriate rules applied to any sport. I am not sure we can do that for off-road racing, but I am happy to try.

Chair Wiener:
Senator Gustavson, can Senator Copening work with the trial attorneys and have those conversations? We will revisit this legislation when you are ready. Those in favor and opposed to this can work together so everyone is included in the conversation.

Ms. Lundvall:
Other states have done what Senator Copening is proposing. For example, Colorado protected its ski industry and identified specific parameters and appropriate safety precautions to ensure participants and ski resort owners have

Senate Committee on Judiciary
March 2, 2011
Page 10

some balance. The Normans will work to identify safety measures and bring others to the table so that effort can be done.

SENATOR ROBERSON:
I concur with Senator Copening. Perhaps Mr. Norman has some insight regarding whether there is a national organizing body that can work toward developing certain rules.

Mr. Bradley, you said you hope off-road racing is successful in Nevada. My concern is that a mere negligence standard would effectively shut the industry down in Nevada. The use of the lawyer pays law is rare in Nevada. If there is a mere negligence standard, it is an open invitation for unscrupulous lawyers to file frivolous lawsuits. We do have to keep the gross negligence standard, which is in this bill, but we have to look at what is reasonable as it relates to crowd controls.

MR. BRADLEY:
I disagree with you regarding frivolous and nonmeritorious lawsuits and the failure to use the lawyer pays law. Any lawyer defending a case in Nevada has the same opportunity to bring that against a lawyer who has frivolously filed a case. I have been a contingency-fee lawyer for 30 years. I have never made any income from filing a frivolous case. I invest the funds necessary to investigate a case to ensure it is a meritorious claim. Many fine defense lawyers, including Ms. Lundvall, are ready to chew up a lawyer who files a frivolous case. Our society is tired of the filing of frivolous cases by unscrupulous lawyers. We cannot stop every one of them, but the Nevada Supreme Court and the State Bar of Nevada have effectively addressed that. Laws have been passed to address them. Our lawyer pays law is one of the strongest in the United States in terms of making a lawyer personally responsible. If it is not used, that means the defense lawyers are not using it when a frivolous case is filed. I am not using it when a drunk driver slams into a car full of kids at a red light, and the insurance company and their lawyers defend it for two years. Under both sets of circumstances, the filing, maintaining or defending of a frivolous case is wrong.

SENATOR ROBERSON:
I understand your perspective. But the fact is, meritless lawsuits will be filed if there is a mere negligence standard, and it will have a chilling effect on this sport.

Senate Committee on Judiciary
March 2, 2011
Page 11

MR. BRADLEY:
Negligence means unreasonable conduct. It is not mere.

SENATOR ROBERSON:
As opposed to gross negligence.

MR. BRADLEY:
Gross negligence is reckless conduct. Gross negligence is defined as intentional conduct in this bill. Could we prove that promoter in the video intended to kill eight people? That is a state of mind. Under this bill, those eight victims would have no remedy because of poor crowd control. If they had no insurance, the taxpayers would pay for the negligence of the promoter.

SENATOR ROBERSON:
I hope we can agree there must be a more reasonable way to regulate this sport without opening it to lawsuits. A simple negligence standard will open this sport to multiple lawsuits. People will not come to this State to promote races if that is the standard. I would like to work with you and Mr. Norman to establish reasonable regulations and crowd control so everyone is satisfied safety measures are in place.

MR. BRADLEY:
The standard is negligence. This bill does not lower the standard. No cases against a race promoter have been filed in Nevada. The sport is doing well in this State. It does not appear it is being driven out of business because of a straight negligence standard.

CHAIR WIENER:
Senator Copening will continue the dialogue. Everyone is invited to participate. I will close the hearing on S.B. 156 and open the hearing on S.B. 186.

**SENATE BILL 186**: Revises provisions relating to the recording of documents. (BDR 2-185)

LORA E. MYLES (County Recorders):
I am here on behalf of the county recorders. Senate Bill 186 is a simple fix to a growing problem caused by an increase in foreclosures and creditor judgments. People obtain judgments and do not tie them to real property or mobile homes. As a result, when the mobile home or real property is foreclosed upon or sold,

Senate Committee on Judiciary
March 2, 2011
Page 12

those judgments are not satisfied because they are not tied to the property. They are tied to a person's name. Regarding section 1 of the bill, we are asking if a judgment is filed with a county recorder's office, information on the real property or mobile home be included in a cover sheet with a copy of the judgment from the court. This makes it clear the property is subject to a lien.

The other issue is addressed in sections 3 and 4 of the bill regarding probates, guardianships and lien holders. The statutes do not require letters of probate to be filed. A lien holder on a property has no notice a probate is occurring. For example, a probate may be in the First Judicial District and the property is held in the Fourth Judicial District.

Letters of guardianship must be filed. However, the statute does not require that they be filed in every county where real property is located or that information concerning the property be tied to the letters of guardianship. As a result, lien holders are not aware of the guardianship. If a property is foreclosed upon and the guardian tries to find the property, he discovers the property is already foreclosed upon and the estate or ward loses that property. If a lien is filed on a property or a probate or guardianship recorded, a simple fix would be to require information about the property—including the assessor's parcel number, location of the property and serial number of the mobile home—be included to tie those documents to the property.

CHAIR WIENER:
In section 1, subsection 4, paragraph (d), page 3, lines 42 to 43, the bill says, "… based on the personal knowledge of the affiant, and not upon information and belief." Please explain the distinction between "personal information" and "information and belief."

MS. MYLES:
If the judgment creditors are going to file liens against property, they must know the person they are suing actually owns the property. For example, we had a case where the judgment creditor sued Junior, but filed the lien against Senior's property. The judgment creditor did not check to ensure the social security number Junior was using was his personal social security number and not Senior's. The judgment creditor did not check to ensure the property was owned by Junior and not Senior. As a result, when Senior was placed under a guardianship, the guardian found a lien against the property that was supposed to have been filed against Junior's property. The judgment creditor refused to

Senate Committee on Judiciary
March 2, 2011
Page 13

remove the lien. We are asking the judgment creditor to say he has verified the information and knows it to be true.

CHAIR WIENER:
You are referring to actual knowledge.

MS. MYLES:
Yes.

CHAIR WIENER:
My thought is that it would say on the "actual knowledge of the affiant and not upon false information and belief."

MS. MYLES:
The language contained in section 1, subsection 4, paragraph (d) is standard throughout NRS in many provisions. It is also standard in any oath taken.

ALAN H. GLOVER (Former Senator; Carson City Clerk/Recorder):
I am an ex officio Public Administrator for Carson City. Regarding section 3 of the bill, as Public Administrator, I was asked to be the administrator of a woman's estate who was a resident of Carson City, but her only asset was a lot and mobile home in Lyon County. There were no other assets. We put the property on the market. In the meantime, the mortgage company foreclosed on the property. I did not receive notice. The mortgage company sent the notice to the correct people but did not know we existed. If this was recorded in the county of the real property location, we would be notified action is being taken. In this case, the property would have gone into foreclosure anyway. If we had known, we would have tried to work with the mortgage company to keep it on the market longer.

From the county recorder's standpoint, the bill cleans up the language regarding how liens are filed, and it will work well for recorders and administrators of estates.

ROCKY FINSETH (Nevada Land Title Association):
We support S.B. 186.

Senate Committee on Judiciary
March 2, 2011
Page 14

SENATOR MCGINNESS:
I put this bill in on Ms. Myles' behalf because she needed the time to study this issue.

CHAIR WIENER:
I will close the hearing on S.B. 186 and open the hearing on S.B. 194.

SENATE BILL 194: Urges the Nevada Supreme Court to amend the Nevada Rules of Civil Procedure to require certain disclosures in class action lawsuits. (BDR S-563)

SENATOR JOSEPH (JOE) P. HARDY (Clark County Senatorial District No. 12):
I discovered people who are de facto opted into class action suits sometimes do not understand the ramifications involved. If they try to sell their condominiums or refinance their homes, they discover they are in class action suits and are precluded from processing the financial future they thought they had.

The Legislative and Judicial Branches of government are separate and distinct. But we, as the Legislature, can urge the Judicial Branch. You will see the word "urge" in the bill. We try to give our input into judicial procedure. You have a handout regarding notice requirements in class actions (Exhibit G).

The federal requirements in class action suits were changed in 2009 to become more transparent. Exhibit G, page 1, lists seven requirements included in the Federal Rules of Civil Procedure. Nevada's rules require three of those items: Nos. 4, 5 and 7. The other items involve transparency people want when they find themselves involved in a class action suit.

In a class action suit, people are notified they are in a class action suit and informed they can opt out. One of the challenges is that people are not sure why to opt out. Section 1, subsection 5 of the bill requires additional disclosure setting forth the possible consequences a member of the class may face if the person does not opt out.

CHAIR WIENER:
Do you intend this Committee would send your urging to the Nevada Supreme Court because you are asking the Nevada Rules of Civil Procedure be amended to require this disclosure? Are you asking us to determine which of the remaining four items in Exhibit G, page 1, should be included?

Senate Committee on Judiciary
March 2, 2011
Page 15

SENATOR HARDY:
I could not have said it better. The people of Nevada should have what the federal rules require.

CHAIR WIENER:
To clarify, rather than asking us to determine which of the remaining four to include, is it your intention to urge the Nevada Supreme Court to amend the Nevada Rules of Civil Procedure to mirror the seven points in the 2009 Federal Rules of Civil Procedure notice requirements?

SENATOR HARDY:
Yes.

SENATOR COPENING:
What have been the negative consequences of class action lawsuits?

SENATOR HARDY:
In construction defects cases, owners of condominiums discovered they were named in a class action suit. When they attempted to refinance or sell their condominium, they were mired in a lawsuit which precluded the lending institutions from participating in the refinance or sale. In Las Vegas and Nevada, we are familiar with class action suits and the challenges associated with them. I would prefer not to see Nevada in those kinds of stories in the news media.

SENATOR COPENING:
For full disclosure, I work for Pulte Homes and Del Webb as a lifestyle director, not dealing with construction defect litigation. I worked for them as director of public affairs between 2002 and 2006. I was involved in numerous construction defect situations, and those very things happened.

Some situations have served homeowners in a good way. Disclosure needs to happen when class actions are filed. In all fairness, there are two sides to the story, and there can be two different outcomes.

I would like to see something similar to initiative petitions. A ballot sets forth a proposal, and pros and cons are given. Voters decide what they want to do given the pros and cons. That is a fair way to present a situation. It would be different for each kind of class action. You could have general pros and cons when it comes to the different kinds of class actions.

Senate Committee on Judiciary
March 2, 2011
Page 16

SENATOR HARDY:
That is where the broadened language of the federal requirements come in. Number 3 on Exhibit G, page 1, includes claims, issues and defenses. Those would become more transparent. I do not recommend eliminating class action lawsuits, but I want people to have access to information so they can make better decisions.

MR. BRADLEY:
We oppose S.B. 194. I am concerned about the federal rules because they have been interpreted by people who represent class actions in a way that scares people out of them by discussing possible consequences rather than probable consequences. It reminds me of when people say, "what if this happens." "What if" is not a reason upon which to base a decision of whether to join a class. It is better to inform people of what is more likely to occur on both sides of the case. The urging language is meant to dissuade people from participating in classes. The pros and cons should be explained so people understand it thoroughly.

The Nevada Supreme Court has abolished class actions in construction defect cases. That resulted in pros and cons. If there is a development with 20 defective homes, each claim must be filed individually and a deductible must be paid on each house. That has harmed small subcontractors who make less on their part of a construction than the deductibles on their insurance policies to trigger coverage.

In other class actions, information is good, but it must be reliable information on both sides of the equation, not information meant to scare people away from participating. That is not what the federal rules say. The opportunity to opt out is already in the rules.

CHAIR WIENER:
Based on what Senator Copening and Mr. Bradley have said, do you want to look at the pros and cons of participating?

SENATOR HARDY:
I appreciate the wording regarding reliable information. I support transparency.

Senate Committee on Judiciary
March 2, 2011
Page 17

CHAIR WIENER:
Will you work with the Nevada Justice Association to develop what makes sense for the balance?

SENATOR HARDY:
Yes.

MR. BRADLEY:
I will involve other lawyers who do class actions. Here is my concern. If we do not mimic the federal rules, we are an individual state. I was appointed to the Nevada Supreme Court committee tasked with bringing the Nevada Rules of Civil Procedure into consistency with the Federal Rules of Civil Procedure. Former Chief Justice William A. Maupin headed the committee. It was challenging because Justice Maupin thought if we have consistent rules from state to federal, there is a broader body of law to help interpret the provisions of either the Nevada Rules of Civil Procedure or the Federal Rules of Civil Procedure. The problem with going out on our own is that we would become an individual state in creating a new law in the Nevada Rules of Civil Procedure inconsistent with the federal rules. This would make it difficult in the absence of an intermediate appellate court. I recognize the desire to try to amend the rules. I cannot agree to amend it to the federal rules because that language goes too far and is too broad. I have concerns about trying to do our own Nevada rules when sophisticated civil procedure lawyers have designed the rules with more knowledge than we have.

CHAIR WIENER:
Can we not work under the umbrella of one that is already federal, in looking at the four remaining items?

MR. BRADLEY:
I hope we can. We would have to involve attorneys who work in class actions and see if that is workable.

CHAIR WIENER:
We will see where the conversation goes and get an update to see what our choices are.

I will close the hearing on S.B. 194 and open the hearing for public comment.

Senate Committee on Judiciary
March 2, 2011
Page 18

There being nothing further to come before the Committee, we are adjourned at 9:38 a.m.

RESPECTFULLY SUBMITTED:

_____
Kathleen Swain,
Committee Secretary

APPROVED BY:

_____
Senator Valerie Wiener, Chair

DATE:_____

Senate Committee on Judiciary
March 2, 2011
Page 19

| | | **EXHIBITS** | |
|---|---|---|---|
| **Bill** | **Exhibit** | **Witness / Agency** | **Description** |
| | A | | Agenda |
| | B | | Attendance Roster |
| S.B. 156 | C | Roger Norman | Video |
| S.B. 156 | D | Roger Norman | Written testimony |
| S.B. 156 | E | Bill Bradley | Video |
| S.B. 156 | F | Bill Bradley | NRS 7.085 |
| S.B. 194 | G | Senator Joseph (Joe) P. Hardy | Federal Notice Requirements In Class Actions |